SCC COMMUNICATIONS CORPO-
RATION, a Delaware corpora-
tion, Plaintiff,

v.

J. Clarke ANDERSON, an individual;
et al., Defendants.

No. CIV.A. 00–WM–1681.

United States District Court,
D. Colorado.

March 22, 2002.

C. Dennis Loomis, Lord, Bissell &
Brook, Los Angeles, CA, for plaintiff.

Thomas S. Birney, Dorr, Carson, Sloan & Birney, PC, Denver, CO, Arthur O. Rogers, II, Jeffrey A. Sadowski, Howard & Howard, Bloomfield Hills, MI, for defendants.

## ORDER ON MOTION TO DISMISS OR TO TRANSFER

MILLER, District Judge.

This matter is before me on Defendants' motion to dismiss for improper venue under Fed.R.Civ.P. 12(b)(3) or, in the alternative, to transfer this case to the Western District of Michigan pursuant to 28 U.S.C. § 1404(a).[1] For the reasons that follow,[2] I conclude that this court lacks personal jurisdiction over the Defendants. Rather than dismiss, however, I transfer this case to the Western District of Michigan in the interests of justice pursuant to 28 U.S.C. § 1631.[3]

### Introduction

This is a federal question case arising under 15 U.S.C. § 1051 et. seq. Plaintiff, SCC Communications (SCC), is a Delaware Corporation with its headquarters in Boulder, Colorado. Defendants comprise an assorted collection of individuals and entities: A.J. Boggs & Company (A.J.Boggs), a Michigan Corporation with its principal place in Okemos, Michigan; J. Clarke Anderson (Anderson), Managing Director and Secretary of A.J. Boggs; Emergency Services Network, an entity owned by A.J. Boggs; and Does one through five, who acted in some unknown capacity.

SCC brought this action for unfair competition under federal and state law, federal trademark dilution, and cyberpiracy. Plaintiff seeks damages as well as injunctive and declaratory relief.

### Background

A.J. Boggs was formed in 1989 and has been incorporated since December 31, 1991. The company appears to be in the business of providing computer systems integration, internet server products and engineering services.[4] On May 16, 1996, A.J. Boggs registered the Internet domain name "911.net" with Network Solutions, Inc.[5] The registration listed Anderson as the administrative contact.

---

1. Although Defendants move to dismiss pursuant to Fed.R.Civ.P. 12(b)(3) for improper venue, their argument is made in terms of lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2). Therefore, I rule on jurisdictional grounds.

2. I decide Defendants' motion on the basis of the complaint's well pled facts, sworn declarations of the parties or their representatives, and the parties' briefs. A hearing is not necessary to resolve the matter. D.C.COLO.LR 7.1(L).

3. Clearly Defendants could be sued by Plaintiff in Michigan. Given the progress of this case it is in the interests of justice to transfer it, under 28 U.S.C. § 1631, to an appropriate venue and not simply dismiss for lack of personal jurisdiction. See Ross v. Colorado Outward Bound Sch., Inc., 822 F.2d 1524, 1527 (10th Cir.1987) (noting that 28 U.S.C. § 1631, as opposed to either 28 U.S.C. § 1404(a) or 28 U.S.C. § 1406(a), controls a federal court's action when it finds that it lacks jurisdiction). But see Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466, 82 S.Ct. 913, 916, 8 L.Ed.2d 39 (1962) (stating that § 1406(a) is "amply broad enough to authorize the transfer of cases…whether the court in which it was filed had personal jurisdiction over the defendants or not.").

4. This information comes from one of the "screen shots" provided by SCC. A screen shot is a printed page depicting the visual images seen on a computer monitor when connected to a web page.

5. For a complete discussion of the Internet and its attributes see Reno v. American Civil Liberties Union, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

SCC sells operating system infrastructure, application software, and data-base management services to emergency response providers, which include public safety agencies. SCC designed its systems to facilitate the routing of a "9–1–1" emergency phone call to the appropriate point and, in turn, allow the call's recipient to immediately identify the call's origin.

On November 24, 1998, more than two years after A.J. Boggs registered the "911.net" domain name, SCC was issued a U.S. Trademark Registration for "9–1–1NET." Additionally, SCC owns a U.S. Trademark Registration Application for "911.net" filed January 19, 2000.

During the summer of 2000, SCC used the "911.net" domain name to access the A.J. Boggs web site and printed several screen shots which are attached to its response.[6] The screen shots provide important information about the site's content, including information about the company and its products, services and clients, telephone numbers, and office and electronic mail (e-mail) addresses. A visitor to the site could retrieve this information by accessing interior pages via image hyperlinks.[7] The e-mail addresses were also hyperlinks, allowing a visitor to contact a company employee directly. Nevertheless, the site did not allow a visitor to purchase products or services from A.J. Boggs through the site itself.

Upon discovering that the "911.net" domain name was in preexisting use, SCC contacted Anderson claiming that Defendants' registration and maintenance of the "911.net" domain name violated SCC's legal rights. Defendants disagreed and the parties negotiated whether the Defendants would transfer the domain name. Defendants rejected SCC's offer, subsequently requested a higher transfer price, and ultimately threatened to use or authorize the use of the domain name in SCC's business marketplace.

### Standard of Review

Once a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the exercise of jurisdiction is appropriate.[8] To meet this burden, a plaintiff must present a *prima facie* showing and any factual disputes are resolved in the plaintiff's favor.[9] I may decide this motion based on allegations presented in the complaint, affidavits and other written materials.[10] However, only well pled facts, as opposed to conclusory allegations, must be accepted as true.[11]

### Discussion

In federal question cases, I may exercise personal jurisdiction over the parties to the extent authorized by constitution and statute.[12] Where, as here, the federal stat-

---

**6.** Sometime after the complaint's filing, use of the domain name provided access to a different web site that simply displayed the message "This Site Is Under Construction" and nothing else.

**7.** A hyperlink allows a visitor to move from one web location to another by using the mouse to click twice on the hyperlink symbol. *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 415 n. 2 (9th Cir.1997). Generally the hyperlinks are found as either images or blue or underlined text. *Reno*, 521 U.S. at 852, 117 S.Ct. 2329.

**8.** *Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.* 205 F.3d 1244, 1247 (10th Cir.2000).

**9.** *Id.*

**10.** *Id.*

**11.** *Id.*

**12.** *Hill v. U.S.*, 815 F.Supp. 373, 375 (D.Colo. 1993).

ute does not authorize nationwide service for *in personam* actions, a party may assert jurisdiction exists to the extent allowed by the state in which the district court sits.[13] Therefore, I look to Colorado's statutes for jurisdictional guidance.

Colorado's long-arm statute has been interpreted to extend jurisdiction "to the fullest extent permitted by the due process clause of the fourteenth amendment to the United States Constitution."[14] Thus, my analysis turns on a single inquiry, whether the exercise of personal jurisdiction over defendants comports with due process.[15]

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.' "[16] A court's exercise of jurisdiction, however, will not violate due process if the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "[17]

The minimum contacts standard may be met either through the exercise of general or specific jurisdiction.[18] General jurisdiction arises where the defendant has continuous and systematic contacts with the forum.[19] Here, SCC does not assert that this Court has general jurisdiction over Defendants and claims instead that Defendants have sufficient contacts with Colorado to allow the exercise of specific personal jurisdiction. Specific jurisdiction may be exercised if the defendant has purposefully directed its activities toward the forum's residents and the cause of action arises from or relates to those activities.[20]

To meet the first prong of the specific jurisdiction standard—Defendants' purposeful direction of their activities toward Colorado—Plaintiff propounds three theories: first, the nature of the Defendants' web site; second, application of the established effects doctrine; and, finally, the parties' actual negotiations.

### 1. Nature of the Web Site

■ Although courts have only recently applied jurisdictional principles to Internet-related conduct, a fairly well-defined distinction between interactive and passive web sites has already evolved. A passive site is one where the owner has merely posted information on a site accessible to a user in a different forum.[21] Access from a foreign forum alone does not subject a site's owner to the jurisdiction of that forum.[22] The creation of a passive web site, by itself, is not considered an act purposefully directed toward the forum state.[23]

At the other end of the spectrum is the interactive site where the site's owner clearly conducts business over the Internet between different fora.[24] This would occur, for example, when the parties negotiate and enter into contracts requiring the

13. *Id.*; Fed.R.Civ.P. 4(k)(1)(A).

14. *Safari Outfitters, Inc. v. Superior Court in and for the City and County of Denver*, 167 Colo. 456, 448 P.2d 783, 784 (1968).

15. *National Bus. Brokers, Ltd. v. Jim Williamson Prods., Inc.*, 115 F.Supp.2d 1250, 1253 (D.Colo.2000).

16. *Id.*

17. *Kuenzle v. HTM Sport–Und Freizeitgerate AG*, 102 F.3d 453, 455 (10th Cir.1996).

18. *Id.*

19. *Id.*

20. *Id.*

21. *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1296 (10th Cir.1999).

22. *Id.*

23. *Id.* at 1299.

24. *Id.* at 1296.

repeated and knowing transmission of information.[25] In such cases, the exercise of personal jurisdiction would be appropriate over the site's owner.[26]

Most sites, however, are not easily classified as they are neither fully interactive nor wholly passive. Although sites may be somewhat interactive, such as allowing for the exchange of information, the jurisdictional analysis ultimately depends on the "level of interactivity and commercial nature of the exchange of information that occurs on the Web site."[27] That is, the greater the interactivity the more reasonable it is to find that the defendant purposefully directed activities toward the forum state and consequently should have foreseen being haled into the forum's jurisdiction.

Other circuits give some guidance. The Fifth Circuit held a web site that posted information about the company's products, provided a printable mail-in order form, and listed a toll-free telephone number and an e-mail address did not subject the company to personal jurisdiction.[28] Without the ability to make on-line purchases, the court held the web site to be passive and noted that its decision would be the same even if the e-mail address were an e-mail link allowing a visitor to contact the site's owner directly.[29]

The Ninth Circuit specifically addressed the interactivity of an e-mail hyperlink.[30] The defendant in that case created a site advertising web-based professional services and provided a phone number and an e-mail link allowing a visitor to "introduce himself, and invit[ing] a company not on the web—but interested in getting on the web—to 'Email us to find out how!'"[31] However, the site did not offer an option of signing up for service, and the court concluded that the site, even with an e-mail hyperlink, was an "essentially passive web page."[32]

Turning to the A.J. Boggs site, it incorporates several image and underlined hyperlinks. However, one may only link to different pages within the site or to e-mail addresses allowing the visitor to write to company employees. For the most part, the site limits a visitor to retrieval of company information. A visitor does not have the option to purchase products or services, and no evidence exists that suggests the site caused a Colorado resident to do business with Defendants. As such, although several e-mail hyperlinks are present, I find the A.J. Boggs web site was essentially passive and conclude that Defendants did not, through their web site alone, purposefully direct their activities toward Colorado.

### 2. The Effects Doctrine

Plaintiff argues that Defendants purposefully directed their activities toward Colorado under the effects doctrine. The Supreme Court first announced this test in *Calder v. Jones.*[33] Shirley Jones filed a libel suit, in California state court, against National Enquirer, Inc., its local distributing company, and the two Enquirer employees responsible for the allegedly libelous story.[34] The employees moved to

---

25. *Id.*

26. *Id.*

27. *Id.*

28. *Mink v. AAAA Dev. LLC,* 190 F.3d 333, 336–37 (5th Cir.1999).

29. *Id.* at 337 & n. 1.

30. *Cybersell, Inc.,* 130 F.3d 414.

31. *Id.* at 415–16.

32. *Id.* at 419–20.

33. 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

34. *Id.* at 784–85, 104 S.Ct. 1482.

quash service for lack of personal jurisdiction since they were Florida residents and had written, researched, and edited the article in that state.[35]

The Court held that jurisdiction was proper based on the "effects" of the employees' Florida conduct in California.[36] That the actions causing the effects were performed outside the state did not prevent California from exercising jurisdiction over a cause of action arising out of those effects.[37]

■■■ This test has found particular application not only in defamation actions but also in trademark dilution and cyberpiracy litigation. In just such an action, the Ninth Circuit succinctly set forth the elements upon which a court can base its personal jurisdiction: "(1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum state."[38] Merely registering another's trademark as a domain name is not alone a sufficient basis for the exercise of personal jurisdiction.[39] Instead, "something more" must exist to demonstrate that the defendant intentionally directed activities toward the forum state.[40] Since the Tenth Circuit has not specifically addressed the *Calder* test in relation to trademark or cyberpiracy, I find the Ninth Circuit's analysis persuasive.

■■■ In the instant case, SCC argues that Defendants' threat to use the domain name in SCC's business marketplace and their subsequent (and higher) counteroffer constitute the "something more" under the effects doctrine. However, SCC's proffered application of the *Calder* test completely ignores timing. A.J. Boggs registered the "911.net" domain name in May 1996. SCC did not receive its "9–1–1NET" trademark until November 1998—two and a half years later. Moreover, SCC did not file its second "911.net" trademark application until January 2000—another year later. To meet the *Calder* test here, SCC essentially projects that Defendants registered the "911.net" domain name intending someday to extort money from SCC or cause other harm if and when SCC obtained the trademark while operating in Colorado.

As that restatement of Defendants' position demonstrates, Defendants should not be made subject to Colorado jurisdiction when there is no showing of any intent to do harm to SCC in Colorado. Absent some extraordinary circumstance, a plaintiff's intellectual property rights must preexist the defendant's alleged wrongful acts. Indeed, courts appear to exercise *Calder* jurisdiction in cyberpiracy actions only where the defendant, in a profiteering scheme, registered the domain name of an existing and previously registered trademark.[41] To find otherwise would subject a

---

**35.** *Id.* at 784–86, 104 S.Ct. 1482.

**36.** *Id.* at 789, 104 S.Ct. 1482.

**37.** *Id.* at 787, 104 S.Ct. 1482.

**38.** *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1321 (9th Cir.1998).

**39.** *Id.* at 1322.

**40.** *Id.; see also Am. Info. Corp. v. Am. Infometrics, Inc.,* 139 F.Supp.2d 696, 702 (D.Md. 2001) (finding, under *Calder,* that registering a mark as a domain name without evidence of entry, deliberate targeting, or concentration

of harmful effects in the forum state "does not constitute 'effects' sufficient" on which to base an exercise of personal jurisdiction).

**41.** *See Panavision,* 141 F.3d 1316 (holding personal jurisdiction appropriate where defendant had registered plaintiff's mark as a domain name with the intent to sell it to plaintiff); *Euromarket Designs, Inc. v. Crate & Barrel Ltd.,* 96 F.Supp.2d 824 (N.D.Ill.2000) (finding personal jurisdiction where defendant, also a seller of household and furniture goods, registered the domain name "crateandbarrel-ie.com" in an attempt to syphon business from plaintiff); *McRae's, Inc. v. Hus-*

defendant to jurisdiction based, not on its own present conduct, but on some unknown plaintiff's future conduct.[42]

I also note that the "911.net" domain name in dispute is based on a numerical combination recognized generically for emergency services and not for a particular company or commercial product.[43] Defendants, unlike those in *Panavision, Nissan Motor* and *Crate & Barrel,* did not register SCC's name or other distinctive, business trademark.

Plaintiff cannot meet the *Calder* test of personal jurisdiction based on the effects doctrine. I will not ascribe piratical motives to Defendants given the domain name's widely known usage and its earlier registration by Defendants.

### 3. Business or Contract Negotiations

■ The last potential basis for purposeful direction is the parties' negotiations once SCC asserted its claim against Defendants. The Supreme Court, in *Burger King Corp. v. Rudzewicz,* specifically addressed this sort of conduct in the context of personal jurisdiction, holding that a contract with an out-of-state resident does not automatically establish suffi-

cient minimum contacts.[44] Instead, factors such as prior negotiations, contractual terms, future consequences and course of dealing "must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum." [45]

In the instant case, the parties did not have a previous relationship or course of dealing and reached no agreement. Accordingly, it is only the parties' negotiations which would provide any barometer to determine whether Defendants purposefully established minimum contacts.

In making that determination, the recent Tenth Circuit case, *Soma Med. Int'l v. Standard Chartered Bank,* is instructive.[46] In *Soma,* the plaintiff opened a bank account with defendant's Hong Kong branch.[47] At some point during the banking relationship, a co-defendant, Leonard D. Fong, began to fraudulently withdraw funds from plaintiff's account.[48] Plaintiff filed an action in Utah, and the bank moved to dismiss for lack of personal jurisdiction.[49]

Jurisdictional facts included that the bank had: (1) sent by mail a signature card to plaintiff; (2) sent two letters to

*sain,* 105 F.Supp.2d 594 (S.D.Miss.2000) (finding personal jurisdiction where defendant had registered plaintiff's trademark where the mark was used in the identification of a department store chain); *Nissan Motor Co., Ltd. v. Nissan Computer Corp.,* 89 F.Supp.2d 1154 (C.D.Cal.2000) (finding personal jurisdiction since defendant changed the content of its web site to exploit plaintiff's goodwill by profiting from consumer confusion).

**42.** Principles of personal jurisdiction do not support SCC's reading of the *Calder* doctrine. The Due Process Clause is intended to give "a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S.

286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

**43.** Also, due to the tragic events of September 11, 2001, the numerical sequence now carries an independent meaning distinct from emergency services.

**44.** 471 U.S. 462, 478, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985).

**45.** *Id.* at 479, 105 S.Ct. 2174.

**46.** 196 F.3d 1292.

**47.** *Id.* at 1294.

**48.** *Id.* at 1294–95.

**49.** *Id.* at 1295.

plaintiff's local bank requesting signature verification; (3) initiated fourteen other written communications with plaintiff; and (4) created an account for plaintiff and acknowledged the formation of a business relationship.[50] The Tenth Circuit noted that, as a general rule, phone-calls and letters are not themselves sufficient to create minimum contacts; it concluded that, despite the established banking relationship and significant correspondence, personal jurisdiction did not exist over the bank.[51]

Here, unlike *Soma*, the parties never entered into a business relationship. SCC initiated communication and demanded the domain name's transfer. The resulting negotiations took place by phone or letter; no meeting occurred in Colorado. With *Soma* as a guide, I cannot conclude that Defendants purposefully directed their activities toward Colorado via their negotiations. Indeed, to hold otherwise would emasculate the now-established rule that a passive web site does not create specific personal jurisdiction and empower a claimed victim to fashion an automatic "home court advantage" by simply initiating negotiations with the alleged cyberpirate.

### Conclusion

I am mindful of my duty to provide a convenient forum for Colorado citizens potentially harmed by out-of-state actors and therefore do not reach this decision lightly. However, without a stronger marshaling of minimum contacts, SCC has failed to meet its burden. Given the materials presented as well as the controlling law, I find Defendants did not purposefully direct their activities toward Colorado. Accordingly, I need not examine the remaining portions of the test. I lack personal jurisdiction

over Defendants and should transfer the case pursuant to 28 U.S.C. § 1631.

It is ordered that Defendants' motion to dismiss or to transfer is granted in part, and this matter shall be transferred to the Western District of Michigan.

50. *Id.* at 1298.

51. *Id.* at 1299.